UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80204-CR-MARRA

UNITED STATES OF AMERICA

vs.

JOSE LUIS TREJO QUINTANAR,

Defendant.
_____/

## *PLEA AGREEMENT*

The United States of America and JOSE LUIS TREJO QUINTANAR (hereinafter referred to as the "defendant") enter into the following agreement:

1.    The defendant agrees to plead guilty to Counts One, Three, Five, and Seven of the Indictment. Count One charges the defendant with conspiracy to possess with intent to distribute fifty (50) grams or more of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.   Counts Three, Five, and Seven each charge the defendant with possession with intent to distribute fifty (50) grams or more of methamphetamine, in violation of Title 21, United States Code, Section 841 (a)(1).

2.    The United States agrees to seek dismissal of Counts Two, Four, and Six of the Indictment after sentencing.

3.    The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines").   The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the

Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense(s) identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed. The defendant is also aware that the guidelines do not provide for parole.

4.       The defendant understands and acknowledges that as to each of Counts One, Three, Five, and Seven, the Court must impose a statutory minimum term of ten (10) years imprisonment, up to a statutory maximum term of life imprisonment, followed by a minimum term of supervised release of five (5) years up to a maximum term of life, and a maximum fine of $10 million.

5.       The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this agreement, a special assessment in the amount of $100 per count, for a total of $400, will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If the defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6.      Although not binding on the probation office or the Court, this Office and the defendant agree that they will jointly recommend that, pursuant to U.S.S.G. § 5C1.2, the Court impose a sentence without regard to any statutory minimum sentence identified in paragraph 4 above, provided that:

(a) the defendant is not found to have more than one criminal history point, as determined under the Sentencing Guidelines;

(b) not later than the time of the sentencing hearing the defendant provides to this Office all information and evidence the defendant has concerning the offenses that were part of the same course of conduct or of a common scheme or plan as charged in the Indictment; and

(c) the defendant is not found to have used violence or threats of violence, or to have possessed a firearm or other dangerous weapon in connection with the offense; that the offense did not result in death or serious bodily injury to any person; and that the defendant is not found to have been an organizer, leader, manager or supervisor of others in the offense.

7.      Although not binding on the probation office or the Court, the parties will jointly recommend that the Court make the following findings with regard to the defendant's relevant conduct:

(a) Pursuant to U.S.S.G. § 2D1.1, the amount of actual methamphetamine for which the defendant is responsible is more than 500 grams, but less than 1.5 kilograms, resulting in a base offense level of 34;

(b) Other than the potential 2-level reduction for safety-valve, the 2-level reduction for "zero-point offenders," and the 3-level reduction for acceptance of responsibility, there are no other guidelines enhancements nor reductions that apply to this case.

3

8.      Although not binding on the probation office or the Court, the United States and the defendant agree that they will jointly recommend that the Court impose a sentence <u>within and at the low-end of the advisory guideline range.</u>

9.      The defendant agrees, in an individual and any other capacity, to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense of conviction, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense, pursuant to Title 21, United States Code, Section 853. In addition, the defendant agrees to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). The defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. The defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution. In addition, the defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. Rs. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

10.     This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

11.     The United States agrees that it will recommend at sentencing that the Court

reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If, at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government and the court to allocate their resources efficiently. The United States, however, will not be required to make this recommendation if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

12.     The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the

recommendation in its entirety.  The defendant understands and acknowledges, as previously acknowledged above, that the defendant may not withdraw the defendant's plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

13.     The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States.

14.     The defendant is aware that Title 28, United States Code, Section 1291 and Title 18, United States Code, Section 3742 afford the defendant the right to appeal the sentence imposed in this case.  Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Sections 1291 and 3742 to appeal any sentence imposed, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing.  The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section

3742(b) and Title 28, United States Code, Section 1291.   However, if the United States appeals the defendant's sentence pursuant to Sections 3742(b) and 1291, the defendant shall be released from the above waiver of his right to appeal his sentence.

15.     The defendant further hereby waives all rights conferred by Title 28, United States Code, Section 1291 to assert any claim that: (1) the statute(s) to which the defendant is pleading guilty is/are unconstitutional; and/or (2) the admitted conduct does not fall within the scope of the statute(s) of conviction.

16.     By signing this agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney.   The defendant further agrees, together with this Office, to request that the Court enter a specific finding that the defendant's waiver of his right to appeal the sentence imposed in this case and his right to appeal his conviction in the manner described above was knowing and voluntary.

17.     The defendant acknowledges that he has fully discussed the matters of this plea agreement and his guilty plea pursuant thereto with his attorney, and that his attorney has answered each of his questions about the strength of the government's case as well as the following rights: to go to trial, to cross-examine the government's witnesses, to testify in his own behalf, to not be compelled to provide self-incriminating testimony, to call witnesses for the defense, and to appeal any adverse verdict that may result from a trial.   The defendant further acknowledges that he is fully satisfied with the representation provided by his attorney.

18.     This is the entire agreement and understanding between the United States and the

defendant.   <u>There are no other agreements, promises, representations, or understandings between</u>

<u>the parties in this case.</u>

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 2/6/24     By: _____

RINKU TRIBUIANI
ASSISTANT UNITED STATES ATTORNEY

Date: 2/6/24     By: _____

VALENTIN RODRIGUEZ
ATTORNEY FOR DEFENDANT

Date: 2/6/24     By: _____

JOSE LUIS TREJO QUINTANAR
DEFENDANT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-80204-CR-MARRA**

UNITED STATES OF AMERICA

vs.

JOSE LUIS TREJO QUINTANAR,

> Defendant.

_____/

## FACTUAL BASIS FOR CHANGE OF PLEA

In or around August 2023, agents from the DEA and the PBSO initiated an investigation into the drug trafficking activities of a Hispanic male who was distributing cocaine in and around Palm Beach County, Florida.  This investigation was initiated based upon information obtained from a law enforcement source, which advised that a Hispanic male was utilizing telephone number (561) 814-XXXX to distribute cocaine in and around Lake Worth, Florida. As a result of information developed during the investigation, agents positively identified the Hispanic male as Jose Luis TREJO QUINTANAR ("TREJO").

On August 17, 2023, agents from the PBSO held an operational briefing in preparation for a controlled purchase of cocaine.  At approximately 10:55 a.m., a PBSO undercover agent ("UC1") placed an outgoing, recorded call to telephone number 561-814-XXXX. A male, believed to be TREJO, answered UC1's call and UC1 advised TREJO that he (UC1) was ready to meet.  TREJO advised UC1 that he (TREJO) would send an address and UC1 acknowledged.  A short time later, UC1 received an incoming text message from telephone number 561-814-XXXX which read, "XXXX 7th Ave N."

Based upon this information, agents established surveillance in the area of XXXX 7th Ave N, Lake Worth. At approximately 11:38 a.m., UC1 arrived at the residence and parked in the driveway. UC1 placed an outgoing call to telephone number 561-814-XXXX and advised TREJO he had arrived. TREJO acknowledged and the call ended. After waiting several minutes, UC1 did not see anyone at or near the residence; therefore, he placed another call to telephone number 561-814-XXXX. During this call TREJO, directed UC1 to knock at the door of the residence. UC1 ended the call, walked to the door of the residence and knocked. A Hispanic female answered the door and invited UC1 inside. UC1 declined the invitation to enter and then observed a Hispanic male inside the residence. The Hispanic male asked UC1 how much he wanted to purchase and UC1 advised $100. The Hispanic male then gave UC1 two small bags containing a white substance, and UC1 gave the Hispanic male $100 of PBSO investigative funds. UC1 then returned to his vehicle and left the area. Despite investigative efforts, agents have not yet identified the Hispanic male or the Hispanic female who were present and/or participated in this drug transaction at the direction of TREJO.

Following this controlled purchase, UC1 conducted a field test of the substance, which weighed approximately 1 gram and obtained a positive result for the presence of cocaine. The cocaine was then submitted to the PBSO evidence department. This drug transaction was both audio and video recorded. The audio/video recording of the transaction, as well as the recorded telephone calls and text messages exchanged with TREJO before and during this operation, were also submitted to the PBSO evidence department.

On August 22, 2023, agents from the PBSO held an operational briefing in preparation for a second controlled purchase of cocaine from TREJO and/or his associate. Following the briefing, UC1 placed an outgoing call to telephone number 561-814-XXXX, but the call went to voicemail.

Through a series of telephone text messages and recorded calls on this same date, TREJO ultimately directed UC1 to the residence at XXXX Lake Worth Road, Lake Worth, Florida to conduct the cocaine transaction.

Based upon this information, agents established surveillance in the area of XXXX Lake Worth Road, Lake Worth, Florida.  At approximately 3:17 p.m., UC1 arrived to the residence and called telephone number 561-814-XXXX.  TREJO answered the call and as UC1 spoke with TREJO, he (UC1) observed TREJO, who was still on the phone with UC1, open the east door of the residence.  The call ended and TREJO approached the front passenger door of UC1's vehicle. As UC1 and TREJO spoke through the open window of the front passenger door, TREJO placed two small bags containing a white powdery substance on the seat of UC1's vehicle.  UC1 then handed TREJO $100 of PBSO investigative funds.  UC1 asked TREJO if he had anything else, referring to other types drugs.  TREJO told UC1 he could get crystal, which UC1 understood to be a reference to crystal methamphetamine, as well as marijuana.   TREJO advised UC1 that he (TREJO) could also supply UC1 with larger quantities of drugs and that he (TREJO) would call UC1 from his personal number. UC1 acknowledged and the parties agreed they would talk in the future. A short time later, UC1 received an incoming call from telephone number 561-785-XXXX, utilized by TREJO. UC1 saved the number for future investigation.

Following the above-described drug transaction, the suspected cocaine purchased from TREJO was submitted to the PBSO Chemistry Laboratory for analysis.  This analysis confirmed the substance to be cocaine, with a net weight of .657 grams. The audio and video recording of the drug transaction and the recorded calls and text messages exchanged with TREJO to arrange the drug transaction were also submitted to evidence at the PBSO.

On August 30, 2023, agents held an operational briefing in preparation for UC1 to meet with TREJO and purchase one ounce of crystal methamphetamine. Prior to the briefing, UC1 had been in telephonic communication with TREJO, who identified himself to UC1 as "Jesus," and had arranged to purchase one ounce of crystal methamphetamine in exchange for $450.

Following the briefing, UC1 made several attempts to contact TREJO by telephone to confirm the location in which they would meet to conduct the drug transaction, however, TREJO did not answer.  As a result, agents established surveillance at XXXX Lake Worth Road, Lake Worth, where UC1 had previously met with TREJO and purchased cocaine. At approximately 4:38 p.m., UC1 arrived at the residence, and knocked.  A Hispanic male, later identified as Jorge ROMERO ("ROMERO") opened the door and greeted UC1. UC1 informed ROMERO that he was there to see TREJO, to whom UC1 referred as "Jesus." ROMERO informed UC1 that TREJO was sleeping at the other house and advised UC1 that he (ROMERO) worked with TREJO.  UC1 then told ROMERO he wanted "crystal," referring to crystal methamphetamine. ROMERO removed a small bag from his pocket and showed it to UC1.  As a result of training and experience, UC1 recognized the substance to be crystal methamphetamine; however, UC1 informed ROMERO he needed one ounce. ROMERO then placed a call to an unidentified person.  UC1 listened and heard ROMERO say, "Ask if I can send him there," and then ROMERO said, "Send me the address." Once ROMERO ended the call, UC1 asked ROMERO if TREJO was at the house on 7th, referring to XXXX 7th Ave N, Lake Worth, where TREJO had directed UC1 to on August 17, 2023, when UC1 purchased cocaine. ROMERO affirmed and UC1 left.

At approximately 4:54 p.m., UC1 arrived to XXXX 7th Ave N, Lake Worth and upon knocking at the door, was greeted by the same Hispanic male who sold him (UC1) cocaine at this location on August 17, 2023, and TREJO.  UC1 entered the residence and during conversation

4

with TREJO, TREJO told UC1 that the crystal methamphetamine he had agreed to sell UC1 was at the residence at XXXX Lake Worth Road.  As a result, TREJO directed UC1 to follow him back to the residence at XXXX Lake Worth Road, Lake Worth. UC1 agreed and both he and TREJO returned to XXXX Lake Worth Road.

At approximately 5:44 p.m., while UC1 was parked on the east side of the residence, TREJO entered the front passenger seat of UC1's vehicle.  During conversation, TREJO handed UC1 a clear plastic bag, which further contained a substance UC1 recognized to be crystal methamphetamine.  UC1 then gave TREJO $450.  During conversation, TREJO told UC1 he could provide him with kilogram quantities of crystal methamphetamine and advised the price would be $4,000 per kilogram.  TREJO went on to tell UC1 that if he (UC1) purchased three kilograms or more, then the price could be further negotiated. UC1 acknowledged. TREJO exited the vehicle and UC1 left the area.

Following this transaction, agents submitted the suspected crystal methamphetamine purchased from TREJO to the DEA Southeast Laboratory for further analysis. This analysis confirmed the substance to be methamphetamine hydrochloride, with a net weight of approximately **25.9 grams, with substance purity of 98% ± 6%.**  The interaction between UC1 and ROMERO, wherein ROMERO displayed crystal methamphetamine and directed UC1 to TREJO, as well as the drug transaction conducted with TREJO were audio and video recorded. The audio/video recording, as well as the recorded telephone calls and text messages exchanged between UC1 and TREJO before and during this operation were also submitted to the DEA evidence custodian.

On August 31, 2023, while conducting background investigation of TREJO and ROMERO, DEA agents in West Palm Beach learned that on August 25, 2023, during a controlled

purchase operation, an undercover agent (UC2) from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), who was accompanied by an ATF confidential informant (CI), conducted a controlled purchase of approximately 86 grams of crystal methamphetamine from ROMERO and another Hispanic male, who was later identified as TREJO.  On the date of the controlled purchase, ROMERO and TREJO arrived to XXXX Oakwood Boulevard, Hollywood, Florida in a black Chevrolet truck registered to a woman believed to be TREJO's wife. Agents observed ROMERO exit the front passenger side door of the Chevrolet truck and then enter the rear passenger seat of UC2's vehicle. As UC2 greeted ROMERO, TREJO entered the driver's side rear passenger seat of UC2's vehicle.

After greeting one another, ROMERO handed UC2 a black bag which further contained four small clear plastic bags of a crystalline substance, which UC2 recognized to be crystal methamphetamine.  UC2 explained to ROMERO that he (UC2) only had enough money for three ounces and advised that he could pay ROMERO for the extra ounce in the future.  UC2 handed ROMERO $1,350 of ATF investigative funds.  ROMERO gave a portion of the investigative funds to TREJO and then spoke in Spanish with TREJO, who was talking with an unidentified person on his cellular phone. Following the conversation between ROMERO and TREJO, ROMERO told UC2 that he could not front the fourth ounce of crystal methamphetamine to UC2.  As a result, UC2 removed one of the bags of crystal methamphetamine from the black bag and handed it back to TREJO.  ROMERO then advised UC2 that TREJO could sell UC2 larger quantities of crystal methamphetamine.  ROMERO advised the price for 500 grams of crystal methamphetamine was $5,000.00, but advised UC2 the price would be much better if UC2 purchased three or more whole ones, which the UC understood to mean three or more kilograms. A short time later, ROMERO and TREJO exited UC2's vehicle, returned to the Chevrolet truck and left the area.

Following this transaction, the suspected crystal methamphetamine was submitted to the DEA Southeast Laboratory for further analysis. This analysis confirmed the substance purchased from ROMERO and TREJO to be methamphetamine hydrochloride, with a net weight of approximately **81.5 grams, with substance purity of 98% ± 6%**. This drug transaction was both audio and video recorded. The recording of the transaction as well as the recorded calls exchanged between the ATF CI and ROMERO to arrange the drug transaction were also submitted as evidence. Additionally, UC2 provided DEA agents from the WPBDO with ROMERO's telephone number, which the ATF CI utilized to arrange the above-described drug transaction.

On September 6, 2023, agents from the West Palm Beach District Office of DEA and PBSO held an operational briefing in preparation for a controlled purchase of crystal methamphetamine by UC1 from TREJO. Following the briefing, agents established surveillance at XXXX Lake Worth Road, Lake Worth. Around the same time, UC1 spoke with TREJO by telephone to discuss the purchase of one pound of crystal methamphetamine. During a series of recorded telephone calls with TREJO, TREJO told UC1 he only had four ounces of crystal methamphetamine left and that he (TREJO) would sell them to UC1 for $450 each. UC1 agreed.

At approximately 6:35 p.m., UC1 arrived to XXXX Lake Worth Road, Lake Worth, and parked on the north side of the residence. Moments later, TREJO exited the east door of the residence while holding a black bag. TREJO walked to the front passenger door of UC1's vehicle and entered. Once inside, TREJO turned over the bag, which contained the crystal methamphetamine, to UC1. After discussion with TREJO, UC1 gave TREJO $1,700 of DEA Official Advanced Funds (OAF). During conversation with TREJO, TREJO asked UC1 if he wanted any cocaine. UC1 advised TREJO he didn't have extra money for cocaine. TREJO then opened the front passenger side door and directed ROMERO, who had just arrived at the residence

7

as the driver of a black Chevrolet truck, to get him a "bag" (of cocaine). ROMERO acknowledged and walked into the residence. TREJO then walked into the residence and out of sight. Moments later, ROMERO exited the residence, walked to the driver's door of UC1's vehicle and handed UC1 a small plastic bag of cocaine. ROMERO then walked back to the east door of the residence, entered and was out of view. UC1 then left the area.

Following this transaction, agents submitted the suspected crystal methamphetamine and cocaine, purchased from TREJO and ROMERO, to the DEA Southeast Laboratory for further analysis. This analysis confirmed the substances purchased from TREJO and ROMERO to be methamphetamine hydrochloride, with a net weight of approximately **111.7 grams, with substance purity of 97% ± 6%**, and cocaine with a net weight of .647 grams. This drug transaction was both audio and video recorded. The audio/video recording of the transaction as well as the recorded telephone calls and text messages exchanged between UC1 and TREJO before and during this operation were also submitted to the DEA evidence custodian.

On October 4, 2023, agents held an operational briefing in preparation for a controlled purchase of crystal methamphetamine by UC1 from TREJO. Prior to the date of this briefing, UC1 had been in telephonic communication with TREJO to negotiate the purchase of one pound of crystal methamphetamine in exchange for $2,800. During these communications, TREJO expressed concern to UC1 about his (TREJO's) safety and his (TREJO's) ability to trust UC1 and shared that two of his "people" had recently been arrested. Despite TREJO's concerns, he and UC1 agreed the drug transaction would take place on this date at XXXX Lake Worth Road.

Following the briefing, agents established surveillance in the area of XXXX Lake Worth Road. At approximately 5:48 p.m., UC1 arrived at XXXX Lake Worth Road, parked in the driveway and called TREJO to advise that he (UC1) had arrived. TREJO told UC1 that he

8

(TREJO) was in Orlando and instructed UC1 to leave the money with a female who was in the residence. TREJO explained that once the money had been paid, then he (TREJO) would call UC1 back to inform him (UC1) where to get the crystal methamphetamine, which was "nearby." UC1 declined to conduct the transaction in this manner and instead suggested to TREJO that someone from inside the residence bring the crystal methamphetamine out to him at his (UC1's) vehicle. TREJO reiterated to UC1 that some of his people had just been arrested and that he (TREJO) wasn't sure whether he could trust UC1. After multiple recorded telephone calls were exchanged between UC1 and TREJO without an agreement being reached as to how they would conduct the transaction, UC1 left the area. As UC1 headed northbound on Buffalo Street towards 2nd Avenue, UC1 observed the black Chevrolet truck parked on the east side of the road on Buffalo St, facing the home at XXXX Lake Worth Rd. UC1 recognized the truck as the vehicle that TREJO is known to drive; however, due to heavy tint on all of the windows, UC1 was unable to determine the identity of the occupants. Throughout this undercover operation agents utilized judicially authorized GPS location data for the black Chevrolet Silverado truck and the cellular telephone both known to be utilized by TREJO. GPS data from both of these sources revealed that both the cellular telephone and the Chevrolet truck were in and around Lake Worth, Florida, not Orlando, where TREJO claimed to be during the time of this operation. Furthermore, just prior to the start of this operation, agents learned from GPS data related to the Chevrolet truck that the truck had departed from the Super 8 Motel located at XXXX Hypoluxo Road and traveled to the area of XXXX Lake Worth Road, where TREJO had previously advised UC1 that the drug transaction would occur. During previous recorded telephone calls between UC1 and TREJO, TREJO told UC1 that he was staying at a hotel on Hypoluxo Road. Agents believe TREJO told

9

UC1 he was in Orlando to further himself from the drug transaction, in the event that police action/enforcement were to take place during the controlled purchase operation.

At approximately 6:07 p.m., aerial surveillance captured the Chevrolet truck arrive at the west side of the residence located at XXXX Lake Worth Road, Lake Worth and park next to a dark colored Lexus, which agents previously observed parked at this residence. The driver of the Chevrolet truck, who appeared to be a male, wearing a mask or other face covering, stepped out of the vehicle and placed an item inside the rear, passenger side door of the Lexus. The male then re-entered the driver's seat of the Chevrolet truck and departed. A short time later, UC1 spoke with TREJO by phone. During a recorded call, TREJO instructed UC1 to go back to the residence and pick up the one pound of crystal methamphetamine which TREJO stated was in the back seat of a black Lexus, which was parked behind the residence. TREJO went on to instruct UC1 that once he (UC1) had the crystal methamphetamine, TREJO would call UC1 and provide UC1 with an address on Hypoluxo Rd where UC1 would drop off the money. UC1 agreed to pick up the crystal methamphetamine from the Lexus, but advised he would not drive the payment for the crystal methamphetamine to another location. UC1 and TREJO ultimately agreed that after UC1 obtained the crystal methamphetamine from the Lexus, then UC1 would make payment for the drugs to someone who was inside the residence.

At approximately 6:20 p.m., UC1 arrived back at XXXX Lake Worth Road and parked along the sidewalk on the south side of the residence. UC1 exited his vehicle and while on a recorded call with TREJO, UC1 walked to the rear passenger seat of the Lexus and retrieved the crystal methamphetamine, which was inside of a bag. UC1 confirmed the contents of the bag and then returned to his vehicle. TREJO told UC1 that he (TREJO) was going to hang up, so he (TREJO) could call someone inside the residence to come outside and get the money from UC1.

UC1 agreed and the call ended. UC1 drove his unmarked vehicle to the east side of the residence and waited for someone from inside the residence to come out and accept the payment for the crystal methamphetamine.

At approximately 6:27 p.m., after failed attempts to contact TREJO by telephone and no one exiting the residence to meet with UC1 to collect payment for the crystal methamphetamine, UC1 placed the $2,800 in the front yard of the residence at XXXX Lake Worth Road and departed the area. A short time later, UC1 received an incoming call from TREJO. During this call, UC1 told TREJO the payment for the crystal methamphetamine was in the yard at XXXX Lake Worth Road, Lake Worth. TREJO acknowledged and told UC1 he would send someone to pick up the money.

At approximately 6:42 p.m., aerial surveillance video captured a white Honda sedan bearing Florida license plate 74DSCT and occupied by two Hispanic males, arrive at the residence. Records obtained from the Florida DHSMV revealed the Honda is registered to M.H. at XXXX Perry Avenue, Greenacres, Florida.[1] Around the same time, UC1 received an incoming call from an unidentified male who utilized telephone number 561-785-XXXX, a number that was previously utilized by TREJO. During the recorded call with the unidentified male, UC1 directed the male to the area in the front yard where UC1 placed the money as payment for the crystal methamphetamine. Upon locating the money, the male ended the call with UC1 and the white Honda left the area. Ground and aerial surveillance units followed the Honda until it arrived at the Super 8 Motel located at XXXX Hypoluxo Road, Lantana. The two males exited the vehicle and entered a hotel room. A short time later, aerial surveillance video captured the black Chevrolet

---

[1] This is the address listed on the subscriber detail of the telephone utilized by ROMERO, and the address listed on ROMERO's mother's driver's license.

truck, known to be driven by TREJO, as it arrived at the same hotel room and parked.  The male driver, who was the same male captured by aerial surveillance as he placed the crystal methamphetamine into the Lexus, exited the Chevrolet truck and entered the same hotel room as the two Hispanic males who had recently arrived in the white Honda.

Following this operation, the crystal methamphetamine was submitted to the DEA Southeast Laboratory.   This analysis confirmed the substance purchased from TREJO to be methamphetamine hydrochloride, with a net weight of approximately **445.1 grams, with substance purity of 95% ± 6%.**  This drug transaction was both audio and video recorded.  The audio/video recording of the transaction as well as the recorded telephone calls and text messages exchanged between UC1 and TREJO before and during this operation were also submitted to the DEA evidence custodian.

On October 19, 2023, at approximately 4:32 p.m., UC2 received an incoming telephone call from an unidentified female utilizing telephone number 305-980-XXXX. During the recorded call, the unidentified female informed UC2 that she was calling on behalf of "Jesus," whom UC2 understood to be TREJO.  UC2 acknowledged and the female went on to say that Jesus had "800" available for the price of "5." UC2 understood this to mean that TREJO had 800 grams of crystal methamphetamine for sale for the price of $5,000.  UC2 acknowledged and the call was ended.

On October 22, 2023, at approximately 8:22 a.m., UC1 received an incoming call from a blocked telephone number. Upon answering, UC1 recognized the male voice to be that of TREJO. During this recorded call, TREJO told UC1 he (TREJO) had approximately 850 grams of crystal methamphetamine available and that if UC1 was interested in purchasing it, the cost would be $5,000.  TREJO told UC1 that he (TREJO) had the crystal methamphetamine with him in Miami

and said he could deliver it to UC1 within 2 hours if UC1 was interested.  UC1 acknowledged and the call was ended.

TREJO agrees that the foregoing facts are true and correct and that these facts satisfy each and every essential element of the offenses of conviction.  TREJO further agrees that his relevant conducts includes 500 grams or more, but less than 1.5 kilograms, of actual methamphetamine, based upon the purity levels of the methamphetamine he distributed.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 2/6/24                      By: _____
                                      RINKU TRIBUIANI
                                      ASSISTANT UNITED STATES ATTORNEY

Date: 2/6/24                      By: _____
                                      VALENTIN RODRIGUEZ
                                      ATTORNEY FOR DEFENDANT

Date: 2/6/24                      By: _____
                                      JOSE LUIS TREJO QUINTANAR
                                      DEFENDANT

13